## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LaVaughn Lewis,

        Petitioner,

        v.                              Case No. 04-3019-JWL

Ray Roberts, Warden of El Dorado
Correctional Facility,[1] and Phil Kline,
Attorney General of the State of Kansas,

        Respondents.

_____

### MEMORANDUM AND ORDER

      Petitioner LaVaughn E. Lewis was convicted in Kansas state court of aggravated indecent liberties with a child and was sentenced to 180 months in prison.   Mr. Lewis brings this habeas corpus petition pursuant to 28 U.S.C. § 2254 (doc. 1).   Therein, he contends that: (1) his trial counsel provided constitutionally ineffective assistance by failing to present expert testimony on child interviewing techniques and by failing to interview or present the testimony of certain eyewitnesses; (2) the trial court violated his right to due process and a fair trial by denying him a new trial after the victim recanted her testimony against him; and (3) the

_____

      [1] At the time Mr. Lewis filed his habeas corpus petition, he was incarcerated at Hutchinson Correctional Facility (HCF), and consequently he named Louis Bruce, who is the warden of HCF, as a defendant.   Since then, Mr. Lewis has been transferred to El Dorado Correctional Facility (EDCF), and therefore it appears that the appropriate defendant is now Ray Roberts, who is the warden of EDCF.   Defendants state that they do not object to the court substituting Mr. Roberts as a defendant in place of Mr. Bruce.   Accordingly, the court hereby makes that substitution.

cumulative prejudicial effect of those errors mandates reversal.   After thoroughly reviewing the parties' motions, briefs, and the underlying record, the court finds that the evidence clearly establishes that Mr. Lewis is entitled to no relief.   The Kansas Court of Appeals identified the correct legal principles and did not unreasonably apply those principles in determining that trial counsel's performance was not so deficient that it fell below an objective standard of reasonableness.   To the extent that the victim may have recanted her testimony since trial, that presents newly discovered evidence that does not warrant habeas relief absent an independent constitutional violation or evidence indicating that the prosecutor knew that the victim's testimony was false, neither of which has been established.   Absent any error, then, the cumulative effect of the asserted errors does not warrant relief.   As such, the court denies Mr. Lewis's habeas petition.

## BACKGROUND

Mr. Lewis's conviction stems from a police report in August of 1996 in which his then-eight-year-old niece, C.C., told the police that he had rubbed her vaginal area three times while they were swimming together.   The incident occurred a few days prior when Mr. Lewis had taken C.C. and her brother, R.C., and sister, J.C., swimming.   C.C., R.C., and J.C. are the children of Shelly Kent and Richard Clark.   Mr. Clark and Mr. Lewis are brothers, hence Mr. Lewis is the children's paternal uncle.   At the time the incident occurred, Ms. Kent and Mr. Clark had been divorced for years.   The children were living with their mother and had come to visit their father for the weekend.   Mr. Clark was living in an apartment with his mother,

Patricia, where Mr. Lewis also lived.   During the weekend, Mr. Lewis took the three children swimming at the apartment complex swimming pool.   At the end of the weekend they returned home and C.C. told her mother that Mr. Lewis had touched her private area.   Ms. Kent took the children to the police station to report the incident, and Mr. Lewis was subsequently charged with aggravated indecent liberties with a child.

## I.   **The Trial**

Trial commenced on October 6, 1997.   The prosecution's case rested largely on C.C.'s testimony and her reports of the incident to other adults.   Mr. Lewis was represented by court-appointed counsel, Michael D. Reed.   Mr. Reed's defense theory was that Mr. Lewis did not touch C.C. inappropriately, to the extent that he might have touched her any such touching occurred while he was playing with the children and the touching was accidental and inadvertent, and that Ms. Kent forced C.C. to misconstrue the incident and report it as inappropriate touching in retaliation against Mr. Clark's family for a prior situation that resulted in Ms. Kent's brother, Calvin, being convicted of sexually abusing the children.

At the time C.C. testified at trial, she was ten years old.   She resided with her mother, J.C., and her mother's boyfriend, Gary Shepherd.   She testified that while she was swimming with Mr. Lewis he touched her in a bad way on her private, and that he rubbed her there three times.   After the second time Mr. Lewis did this she told him to stop it, but he touched her and rubbed her there a third time.   According to C.C., R.C. and J.C. were in the pool when it happened, but no one else was around.   After C.C.'s weekend visitation with her father, she told her mother what happened and her mother took her to the police department.   Days later, C.C.

went to counseling with Treeva Berber.   During the course of those counseling sessions, C.C. had written a letter to Mr. Lewis, and that letter was admitted as an exhibit at trial.   On cross-examination, C.C. testified that sometimes Mr. Lewis's girlfriend, Jennifer Selby, would go swimming with them, but she did not remember anyone else that she knew being there when the incident happened.   She testified that there were, however, other people at the pool that day.

The court then read a stipulation to the jury which stated that C.C.'s maternal uncle, Calvin, had sexually abused C.C., R.C., and J.C. over a period of several months from late 1993 to late 1994.   The sexual abuse included anal and vaginal intercourse and lewd fondling.   Calvin was fourteen years old when the sexual abuse had occurred, and he admitted what  he had done and pled guilty.

Ms. Kent took the stand and explained that several years earlier she and the three children had lived with her mother, Gloria, and her brother, Calvin.   Ms. Kent found out about Calvin's sexual abuse of the children when the children's paternal grandmother, Patricia, told Ms. Kent that the children had told her about the abuse.   SRS took temporary custody of the children and placed them with Patricia for a few months.   Patricia began taking the children to sexual abuse counseling with Ms. Berber.   After Ms. Kent got her own place, she got her children back and continued their counseling with Ms. Berber.   Ms. Kent testified that she believed that what happened to Calvin was appropriate, she was glad that he was able to get help, and she was not mad at Patricia for helping out or taking the kids.   At the time of the incident involving Mr. Lewis and C.C., the three children were living with Ms. Kent and had gone to visit their father for the weekend.   The day after they returned home, C.C. crawled up on Ms. Kent's

4

lap, was crying, and told Ms. Kent that her uncle had touched her in her private area.  Ms. Kent

called Mr. Clark to let him know what happened.  Mr. Clark notified the police and Ms. Kent

took the children to the police station, where a police officer interviewed C.C. and R.C.  After

this, Ms. Kent called and made an appointment for C.C. with her counselor, Ms. Berber.

On cross-examination, Mr. Reed attempted to portray Ms. Kent as having been angry

when SRS took the children away from her and placed them with Patricia after the sexual abuse

by Calvin came to light.  After this occurred, Ms. Kent stayed with Patricia for a short period

of time.  While Ms. Kent was staying there, her boyfriend, Mr. Shepherd, visited her and spent

the night at Patricia's.  Patricia reported to Ms. Berber that Mr. Shepherd was physically

abusive to the children.  It also came to light that R.C. had gone to live with Patricia and Mr.

Clark only a week or two after the August 1996 incident was reported to the police.  Ms. Kent

had not seen R.C. since that time and was unaware of where he was living with his father.

R.C. then took the stand.  At the time, he was twelve years old.  He testified that in

August of 1996 his uncle took him and his sisters swimming at the apartment complex where

his grandmother Patricia lived.  He never saw Mr. Lewis rub C.C.'s privates, C.C. appeared to

have been getting along well with and having fun with Mr. Lewis, and C.C. went swimming again

with Mr. Lewis the next day along with Mr. Lewis's girlfriend, Jennifer Selby.  R.C. testified

that after he and his sisters returned home that weekend, he was in the next room listening to

C.C. tell Ms. Kent that Mr. Lewis had touched her.  After that, Ms. Kent took the children to

the police station and R.C. told the police that he had seen Mr. Lewis touch C.C.  At trial, he

denied that what he had told the police was in fact true, and he explained that his mother had

5

made him tell this to the police.  On cross-examination, he testified that he, C.C., and J.C. had all told their mother numerous times about the sexual abuse by Calvin, but she did not do anything about it until they told their grandmother Patricia.  R.C. further testified that Mr. Shepherd had beat him up a lot of times, and his mother told him that she would have Mr. Shepherd beat him up if he did not tell the police that Mr. Lewis had sexually abused C.C. About a week after C.C. and R.C.'s visit to the police, R.C. went to live with his father because Mr. Shepherd kept beating him up.

Ms. Berber testified regarding her counseling with the children relating to the sexual abuse by Calvin.  Some time after that counseling had ended, C.C. came back in for treatment in August of 1996.  C.C. told Ms. Berber that Mr. Lewis had pulled her close, tried to kiss her, and tried to touch her vagina on the outside of her bathing suit.  C.C. told Ms. Berber that this happened three times when R.C. and J.C. were around and Mr. Lewis's girlfriend Jennifer was not present.  Ms. Berber testified that, in her opinion, C.C. was once again exhibiting signs consistent with sexual abuse such as having behavioral problems at school, she was fearful of going back over to her father's house where her uncle might be, she was rather clingy to her mom, and she was able to recall unique distinguishing details regarding the incident.  Ms. Berber recalled a therapy session in which it was alleged that Mr. Shepherd had physically abused the children, but later C.C. and R.C. both told Ms. Berber in separate therapy sessions that their grandmother Patricia had told them to say this.

On cross-examination, Ms. Berber testified that Patricia and the children had told her that the children had tried to tell their mother about the abuse by Calvin but that she had not

believed them at the time.  The subject of one of the therapy sessions had been a letter that Ms. Kent wrote to the children apologizing for not listening to them when they told her that Calvin had molested them.  Mr. Shepherd had participated in another therapy session at Ms. Berber's behest, but he was resistant and became so agitated during the session that Ms. Berber feared he might become physical.  Subsequently, Ms. Kent agreed to limit Mr. Shepherd's interaction with the children.  It was also brought out that Ms. Kent was the individual who had brought the children to the therapy session when they told Ms. Berber that their grandmother Patricia had told them to lie about the physical abuse by Mr. Shepherd.

The prosecution's last witness was Bobby Jo Hohnholt, the police detective who interviewed C.C. and R.C. when Ms. Kent took the children to the police station to report the incident.  Detective Hohnholt testified that C.C. told her in a videotaped interview that Mr. Lewis had touched her three times in her private area, pointing to her vaginal area.  C.C. said that it happened when Mr. Lewis's girlfriend, Jennifer, was not present.  After it happened the first time, C.C. told Mr. Lewis to stop and she went to the other side of the pool to stay away from him, but then it happened two more times.  Detective Hohnholt also conducted a videotaped interview of R.C., who stated that he opened his eyes under water and saw his uncle trying to kiss C.C., then saw him try to rub C.C.'s vaginal area.  When Detective Hohnholt spoke to R.C. more than a year after the videotaped interview, R.C. told her that he lied during the interview because his mother had told him to lie to get revenge against his grandmother and his dad for something that had happened in the past (meaning Calvin's sexual molestation of

the children).   The videotaped interviews were played for the jury at trial.   On cross-examination, Mr. Reed pointed out that Detective Hohnholt did not interview J.C.

The defense presented four witnesses.   The first of these was Jennifer Selby, who testified that she was Mr. Lewis's girlfriend at the time the incident occurred, that she went to the pool with Mr. Lewis and the three children on one occasion, that she did not recall seeing anything inappropriate, and that C.C. acted normally toward Mr. Lewis.

C.C.'s father, Mr. Clark, testified briefly, confirming that Ms. Kent had given him full custody of R.C. shortly after the incident occurred.   He further testified that despite R.C.'s repeated pleas to see his mother, R.C. had not seen his mother since going to live with his father.   According to Mr. Clark, Ms. Kent would always come up with excuses not to see R.C. because R.C. did not get along with Mr. Shepherd.

R.C. testified that he overheard his mother tell C.C. to tell the police detective that Mr. Lewis had tried to mess with her and that she had told him to stop.   On cross-examination, he stated that he had overheard C.C. tell his mother that Mr. Lewis had touched her.

The children's grandmother, Patricia Singleton (formerly Perez), testified that Ms. Kent and Mr. Shepherd had come to stay with her for awhile after Patricia reported the situation involving Calvin to the police because Ms. Kent's mother had "put her out."   From the time that Ms. Kent and Mr. Shepherd moved out of Patricia's house in late 1994 until August of 1996, Ms. Kent had not allowed the children to call or talk to Patricia.   Patricia stated that Ms. Kent had been very angry with her because she was protecting her grandchildren.   On the day that the incident involving C.C. and Mr. Lewis occurred, Patricia had watched from the hill while Mr.

Lewis took the children swimming.  She recalled that lots of people were at the pool that day.  According to Patricia, C.C. did not act angry or mad or hostile toward Mr. Lewis after either of the days when they went swimming.  She also stated that Ms. Kent had refused to see R.C. after he came to live with her and Mr. Clark.  On cross-examination, she testified that she was angry when Ms. Kent moved out of her apartment and got her own place after the situation with Calvin came to light.  She clarified that she was not angry because Ms. Kent had gotten her own place, but rather because Mr. Shepherd, who had abused the children at Patricia's house, was allowed to be with her grandchildren.  Patricia further testified that Ms. Kent's mother, Gloria, was angry because Patricia had reported Calvin for molestation, and Ms. Kent was also mad because Patricia had turned everybody in.

Mr. Lewis took the stand.  He testified that he took the children to the swimming pool at the apartment complex twice that weekend, that he was just playing with them, that his girlfriend Jennifer also went along on the second day, that he never touched C.C. improperly or inappropriately, that there were other unknown adults present at the swimming pool, and that C.C. did not act mad or angry toward him.  On cross-examination, the prosecutor pointed out that R.C. had been living with Mr. Lewis's family for over a year now.

The jury found Mr. Lewis guilty and he was subsequently sentenced to 180 months in prison.  Mr. Lewis's post-trial motion and appeal were unsuccessful.

## II.    **Evidentiary Hearing on State Habeas Petition and Motion for New Trial**

Mr. Lewis subsequently retained new counsel and filed a habeas corpus petition pursuant to K.S.A. § 60-1507 on the grounds of ineffective assistance of trial counsel and a

motion for new trial pursuant to K.S.A. § 22-3501 on the grounds of newly discovered evidence.   In these documents, he argued, first, that he received constitutionally ineffective assistance of counsel insofar as Mr. Reed failed to: (1) retain an expert to testify about the fact that children such as C.C. can be susceptible to suggestive interviewing techniques such as those employed by Detective Hohnholt; and (2) interview certain eyewitnesses.   Second, he argued that he was entitled to a new trial because C.C. had recanted her testimony.   He argued, third, that the cumulative effect of these errors mandated a new trial.   The Johnson County district court consolidated the habeas petition and the motion for new trial and held an evidentiary hearing on May 16, 2002.   Following is a summary of the evidence presented at that evidentiary hearing.

Mr. Reed was present at the hearing and testified about his representation of Mr. Lewis at trial.   His recollection was less than perfect; he explained that he had moved several times since the trial and had been unable to locate his file.   He did not investigate the possibility of using an expert to testify at trial about the proper use of child interviewing techniques.   He was aware that there was always a concern about suggestive interviews where child witnesses were concerned, but his conclusion had always been that suggestibility techniques were more powerful with respect to younger children.   He did not recall the names of the witnesses he interviewed, but he testified that he consulted regularly with Mr. Lewis and Patricia, they brought him information and insights, they would share thoughts about witnesses, and he put on every witness that he thought would be helpful.   He recalled that his strategy had been to put all his eggs in one basket with R.C.'s testimony.   He had interviewed R.C. several times before

the trial and believed that R.C. had always been convincing.  R.C. had consistently maintained that he did not see anything improper occur that day and that he had overheard a conversation between his mother and C.C. in which they were planning to lie about the incident.  Then, at trial, the prosecutor stumbled upon a brilliant line of questioning that basically supported the prosecution's case and Mr. Reed found out during a recess that R.C. had been confused by the line of questioning, but Mr. Reed was unable to rehabilitate R.C. because his credibility with the jury was basically shot by then.

Robert Sanders, a psychologist and expert on child interviewing techniques, testified that when a child is interviewed there is a very high risk that the child will behave as if to satisfy adult expectations rather than stating their actual memories.  Therefore, when interviewing children it is important not to present the child with a demand for performance and instead place the child in an informant role where the interviewer is providing nothing to suggest that the child is supposed to be delivering a certain kind of performance.  He testified that very young children are far more susceptible to suggestibility than 7-9 year olds, but that the concerns are not so much a function of the child's age as they are the child's dependency on his or her family.  For example, a highly divided and conflict-ridden family is likely to produce a child who is extremely vulnerable to that type of performance demand.  According to Dr. Sanders, Detective Hohnholt deviated from the appropriate interviewing protocol when she interviewed C.C. by, for example, establishing the interview as a continuation of C.C.'s involvement with her mother, not initiating a discussion of truth-telling or accurate reporting of memories, and supplying a great deal of verbal structure to assist C.C. with giving brief,

unelaborated answers.    While this was innocuous in and of itself, it supplied the kind of performance-demanding structure that conveyed to C.C. that she was there to supply adult needs, not what she recalled, and consequently the interview was not likely to produce reliable and accurate disclosures.    Based on what Dr. Sanders was able to ascertain about C.C.'s dialogue with Ms. Berber, the type of interview that Ms. Berber conducted of C.C. was likewise not likely to produce reliable and accurate disclosures.    Furthermore, those interviews and the manner in which testimony is generally and was in this case elicited at trial maintained the structure of supposed adult demand.    He testified that whereas the trier of fact generally feels constrained to decide between the guilt of the accused and the veracity of the child, recognizing the significance of such child interviewing techniques is important because it provides the trier of fact with a third option, which is the perspective that the child is not intentionally fabricating a disastrous lie but instead is trying to comply with the often unspoken demands of adults around her.    Dr. Sanders said that C.C. had recanted the allegation that Mr. Lewis had touched her sexually and that C.C. had told Dr. Sanders that she originally said that Mr. Lewis did it because her mother put her up to it.

On cross-examination, the state pointed out that the only persons present when Detective Hohnholt interviewed C.C. were the two of them, and Dr. Sanders admitted that this was a plus in terms of the reliability of the interview.    He also admitted that he was familiar with reports indicating that a ten-year-old victim is as unlikely as an adult to be susceptible to suggestion, and that he was aware that C.C. was only two months away from her tenth birthday when she conducted the interview with Detective Hohnholt.

Matthew J. O'Connor testified for the defense as an expert on defending child sex allegations. Mr. O'Connor graduated from law school in 1993 and has been in private practice since 1996, largely defending criminal cases including many child sex abuse allegations. He testified that in his experience child sex abuse cases are difficult to defend because of jurors' instincts to protect children. He testified that not having an expert testify at trial in this case eliminated any chance of Mr. Reed being able to explain motive, i.e., why C.C. would have made these allegations against the defendant and why the investigation of the case may have rewarded her for continuing to say those kinds of things. He opined that Mr. Reed's representation did not satisfy the standard for adequate representation in a sexual abuse case because Mr. Reed failed to conduct a minimum interview of witnesses and failed to consult an expert, and that as a result Mr. Lewis suffered prejudice by being wrongfully convicted.

Mr. Lewis also testified at the evidentiary hearing, but only briefly. He stated that he had given Mr. Reed a list of witnesses to interview. Among the individuals on that list were J.C., T.W., Anita West, Rita West, LaTonia Wesley, and A.C.

J.C. testified that she was at the pool with C.C. and Mr. Lewis on the day of the incident, that she never saw Mr. Lewis touch C.C. in a sexual manner at any time that day, that C.C. and Mr. Lewis were never alone in the pool, and that C.C. acted fine after they left the pool. Right before the first trial, C.C. had told J.C. that Mr. Lewis never touched her and that her mother and her boyfriend had put her up to it. If she had been called to testify at trial she would have testified that "nothing happened." She recalled going to the police station with her mother, C.C., and R.C., but the police had not wanted to talk to her. Her mother did not allow her to

13

testify and did not allow her to use the phone so that she could have called the police and told them that Mr. Lewis was innocent.  She further testified that she was afraid to make any such phone call because she was scared that she would get beaten by her mother's boyfriend, who used to "beat us."  By the time of the evidentiary hearing, J.C. was nineteen years old.  Her mother had "put [her] out" and she had been living with her grandmother Patricia for three or four years.

T.W. was also swimming on that day with the rest of the group.  She is C.C.'s cousin and was fourteen years old at the time of the evidentiary hearing in 2002, which means that she would have been approximately nine years old at the time of the incident.  She testified that she was swimming and playing at the pool that day, she did not see Mr. Lewis touch C.C. in a sexual manner at any time that day, and C.C. did not act any differently after they left the pool on that day.

Anita West, who is the mother of Mr. Lewis's son, testified that she was at the pool briefly on the day of the incident.  She was standing right outside the pool, as she had just taken her son to Mr. Lewis at the pool.  She did not see Mr. Lewis touch C.C. in a sexual manner at any time, and she did not see C.C. get upset or act differently after she got out of the pool.  She talked to Mr. Reed one time and Mr. Reed told her that he did not need her to testify.  Patricia, LaTonia Wesley, and she believed A.C. had also gone with her to speak to Mr. Reed.

Rita West, who is Anita West's sister, testified that she was in her car on the day of the incident.  Her car was at the top of a hill and she could see the pool from a distance.  She testified that at the time she was watching the pool, C.C. and Mr. Lewis were not in the pool

together and C.C. did not act upset after she left the pool on that day.   If Mr. Reed had contacted her, she would have told him that C.C. acted normally that day.

C.C. testified at the evidentiary hearing.  By that time, she was fifteen years old and was living with her grandmother Patricia.  She stated that she had not wanted to stay with her mother because her mother's boyfriend was abusive.  She testified that her uncle did not touch her in a sexual manner at any time that day, and that she said what she said because "they" told her to, meaning the people who were trying to put Mr. Lewis in jail.  She had written a letter on August 2, 2000, stating that she had been told what to say by her mother and the district attorney.  She did not recall having been interviewed by the police.  She admitted that Mr. Lewis did touch her because she "was about to fall off his back," but that the touch was not on purpose.   She admitted that she had written a letter to Ms. Berber regarding the incident, but she testified that Ms. Berber had told her what to write in that letter.   The judge then confirmed with C.C. his understanding of her testimony, which was that she had told her mother about the touching, that C.C. did not think the touching was meant in a bad way, and that "they" told her to say that the touching was in a bad way.

Elicia Jones, Mr. Lewis's sister, testified that after Mr. Lewis was convicted C.C. had told her that he had not touched her in an inappropriate manner.  Ms. Jones only brought up the subject with C.C. one time and Ms. Jones was not at the pool on that day.   On cross-examination, the state brought out the fact that, for C.C., returning home to live with her mother was not an option.

The state then presented three witnesses.  The first of these was Helen L. Swan, an expert on child interviewing techniques.  She testified that the studies done on the suggestibility of children that were performed by CiCi and Brunk as well as Gail Goodwin looked at children from the ages of three to seven, and that a child's susceptibility to suggestion at age ten is believed to be the same as an adult witness.  In fact, many of the studies show that by the time a child is five or six years old he or she is fairly resistant to even highly suggestible questions.  She testified that Detective Hohnholt's interview was conducted appropriately insofar as it was conducted in a room without distraction, she started off with an appropriate question and followed with open-ended questions, and C.C. was allowed to present a narrative.  She also pointed out that C.C. corrected Detective Hohnholt, indicating her ability and confidence to correct an adult, and that C.C.'s statement regarding the incident was forthright.  She stated that Detective Hohnholt's interviewing technique conformed to the norms and protocols for interviewing children in 1996 and today (meaning 2002).  She also stated that recantations are common in sex abuse cases and the likelihood of recantation is much higher in unsupportive environments.  On cross-examination, she clarified that the susceptibility to suggestibility begins to decline at age four, not age seven, and that the literature states that they are at the same level as adults by age ten.

Brenda Cameron, who was the prosecutor at trial, testified that during her numerous years of experience as a defense attorney, prosecutor, and supervising prosecutor primarily in Salina, Kansas, and Johnson County, Kansas, she had never had any experience with experts regarding interviewing techniques of children and the suggestibility that may occur in those

interviews.  She further testified that she had met with C.C. on at least two occasions prior to trial and C.C.'s version of the events was always consistent.

Scott Toth also testified on behalf of the state.  At that time, he had been with the district attorney's office in Johnson County for fourteen years, working primarily in sex abuse prosecution cases, and was at that time the lead attorney responsible for the child sex abuse unit.  He is also one of the four attorneys on the prosecutor review committee for the Kansas Sexual Predator Act.  In the approximately twenty-five child sexual abuse cases that he had prosecuted, the vast majority of which involved child victims under the age of ten, he had never had a defense attorney call an expert witness regarding the suggestibility of interviewing techniques with respect to child victims.  He admitted, however, that he had no experience with defending child sexual abuse allegations.

## III.    **The State Court Decisions**

The district court judge who presided over the trial of this case was the same judge who presided over the evidentiary hearing and rendered the decision on Mr. Lewis's habeas petition and motion for new trial.  He denied the habeas petition and the motion for a new trial, and the Kansas Court of Appeals affirmed in an unpublished decision.  *See generally Lewis v. State of Kansas*, 77 P.3d 1288 (Kan. Ct. App. 2003) (unpublished table opinion), *available at* No. 89,319 & 89,320, 2003 WL 22345468, at *1-*16 (Dec. 23, 2003).  In affirming the district court judge's decision, the Kansas Court of Appeals engaged in a thorough analysis regarding the state of the law in Kansas regarding the admissibility of expert testimony on child interviewing techniques, and rejected the argument that Mr. Reed's failure to consult with such

17

an expert was objectively unreasonable "based on the state of law at that time." *Id.* at *11. The appeals court further held that Mr. Reed did not act unreasonably by not calling J.C., A.C., T.W. Anita West, Rita West, and LaTonia Wesley as additional witnesses to testify at trial. *Id.* at *11-*13. Lastly, the court affirmed the trial court's ruling denying the motion for a new trial, pointing out that although C.C. wanted to change her testimony she nonetheless still maintained that the touching did in fact happen even if the touching was supposedly not sexual. *Id.* at *15. Further, there was ample evidence showing that C.C.'s recantation may have originated with a sense of loyalty to her grandmother, Patricia, with whom she was residing at the time. *Id.* Accordingly, the appeals court held that the trial court did not abuse its discretion in denying the motion for a new trial. *Id.* The court also rejected Mr. Lewis's argument that the cumulative impact of trial counsel's two errors, compounded with the victim's recantation, mandated reversal, reasoning that the jury was presented with substantial testimony that Mr. Lewis had inappropriately touched C.C. *Id.* at *16.

Mr. Lewis now raises essentially the same arguments in his petition for a writ of habeas corpus. He contends that Mr. Reed provided constitutionally ineffective assistance of counsel by failing to: (1) present expert testimony on child interviewing techniques; or (2) interview or present the testimony of J.C., A.C., T.W., Anita West, Rita West, and LaTonia Wesley. He further contends that the trial court violated his right to due process and a fair trial by denying him a new trial after C.C. recanted her testimony against him, and that the cumulative prejudicial effect of these errors mandates reversal.

18

## STANDARD

Because Mr. Lewis filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), the provisions the AEDPA govern this case. *Jackson v. Ray*, 390 F.3d 1254, 1259 (10th Cir. 2004). Under the AEDPA, the court "must defer to a state court decision adjudicated on the merits unless that decision: (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding.'" *Id.* (quoting 28 U.S.C. § 2254(d)(1)-(2)).

In this case, the Kansas Court of Appeals adjudicated the merits of petitioner's claims and identified the appropriate legal principles, and therefore this court's review is limited to determining whether the appeals court's decision was an unreasonable application of those legal principles or whether it was based on an unreasonable determination of the facts in light of the evidence presented. Under the "unreasonable application" prong, a state court decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision does not satisfy this standard merely because it is incorrect or erroneous; rather, the state court's application of the law must have been objectively unreasonable. *Jackson*, 390 F.3d at 1254. The state court's factual findings are presumed correct unless the petitioner rebuts those findings with clear and convincing evidence. *Turrentine v. Mullin*, 390

F.3d 1181 (10th Cir. 2004); *Young v. Workman*, 383 F.3d 1233, 1236 (10th Cir. 2004).   In

conducting this analysis, this court's ruling must rest on the propriety of the state court's

decision, not its rationale.   *Jackson*, 390 F.3d at 1254 (citing *Aycox v. Lytle*, 196 F.3d 1174,

1177 (10th Cir. 1999)).

## ANALYSIS

For essentially the reasons stated by the Kansas Court of Appeals in its well reasoned

and thorough opinion, the court is unable to find that its decision fails the deferential AEDPA

standard of review.   It was not objectively unreasonable for the appeals court to determine that

Mr. Reed's performance was not deficient with respect to his failure to consult an expert on

child interviewing techniques or the fact that he did not interview or call to testify at trial any

of the six listed witnesses.   Further, habeas relief is unavailable based on C.C.'s revision of her

testimony absent any other constitutional violation or evidence indicating that the prosecutor

knew that the victim's testimony was false.   Consequently, Mr. Lewis's cumulative error

argument is also without merit because the appeals court determined that no error of a

constitutional magnitude occurred.

**I.        Ineffective Assistance of Counsel**

Sixth Amendment ineffective assistance of counsel claims are governed by the familiar

two-part framework of *Strickland v. Washington*, 466 U.S. 668 (1984).   First, the petitioner

must show that counsel's performance was deficient.   *Id.* at 687; *Cannon v. Mullin*, 383 F.3d

1152, 1159 (10th Cir. 2004).   Second, he must show that counsel's performance prejudiced

his defense. *Strickland*, 466 U.S. at 687; *Cannon*, 383 F.3d at 1159. In order to establish that counsel's performance was deficient, the petitioner "must demonstrate that counsel's performance 'fell below an objective standard of reasonableness,'" meaning that it "was not 'within the range of competence demanded of attorneys in criminal cases.'" *Cannon*, 383 F.3d at 1159 (quoting *Strickland*, 466 U.S. at 687-88). To establish prejudice from counsel's deficient performance, the petitioner "'must show that there is a reasonable probability that, but for counsel's unprofessional errors, . . . the [jury] would have had a reasonable doubt respecting guilt.'" *Id.* (quoting *Strickland*, 466 U.S. at 694-95). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). Because the Kansas Court of Appeals already addressed Mr. Lewis's arguments by identifying the correct legal principles, the AEDPA confines this court's review to the question of whether the appeals court's decision involved an unreasonable application of *Strickland* or whether it was an unreasonable determination of the facts in light of the evidence presented.

### A.      Failure to Consult With or Procure Expert Testimony Regarding Proper Child Interviewing Techniques

In order to satisfy the first *Strickland* factor, deficient performance, the petitioner must overcome the presumption that counsel's conduct was not constitutionally defective. *Turrentine*, 390 F.3d at 1204. Judicial scrutiny is highly deferential and counsel's performance must have been more than merely wrong; it must have fallen below an objective standard of reasonableness. *Id.* The court "must make every effort to 'eliminate the distorting

effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). Thus, the court must analyze the appropriate professional standards based on the law and the facts available at the time of the trial of this case in 1997. *See Revilla v. Gibson*, 283 F.3d 1203, 1220-21 (10th Cir. 2002) (noting the parties' mistaken reliance on current facts and legal authorities not available to counsel at the time of trial diverted their attention from a proper contextual assessment of the petitioner's ineffective assistance claim).

As the appeals court pointed out in a lengthy discussion of the issue, Kansas law regarding the admissibility of expert testimony on child interviewing techniques such as that provided by Dr. Sanders during the evidentiary hearing was not well settled at the time of the trial. In support of this rationale, the appeals court pointed out divergent unpublished appellate opinions on this issue as late as the year 2000. For example, in *State v. Trujillo*, No. 83,332, slip op. (Kan. Ct. App. July 7, 2000), the appeals court held that the trial court did not abuse its discretion by denying the admissibility of the same type of testimony offered by Dr. Sanders in another child sexual abuse case. One of the members of the panel in *Trujillo* was also the trial judge in this case, and he wrote a dissent in which he opined that such testimony should be allowed for the limited purpose of rebutting the state's witnesses concerning the appropriateness of their interviewing techniques. Then, only a little over a month later, in *State v. Kastl*, No. 83,785, slip. op. (Kan. Ct. App. Aug. 11, 2000), the appeals court explicitly acknowledged that "Kansas has not addressed the admissibility of general testimony regarding the susceptibility of children to suggestion," but noted that there is a trend toward allowing

22

such evidence to assist the jury with evaluating whether improper investigative techniques were employed with child victims, but not to offer opinions on credibility issues.   It was not until 2002 that the appeals court first opined in a published opinion on this issue that trial counsel provided ineffective assistance by failing to present expert testimony on this issue in another child abuse case.   *See generally Mullins v. State*, 30 Kan. App. 2d 711, 46 P.3d 1222 (2002). In this case, the appeals court noted that although this case shares some striking similarities with *Mullins*, *Mullins* is nonetheless distinguishable because in this case the state presented testimony at the evidentiary hearing indicating that such expert testimony is not commonly utilized, in this case Ms. Swan testified that the police interview conformed to accepted protocol, and in this case the state did not emphasize the correctness of the interviewing techniques or offer evidence commenting on C.C.'s credibility.   Accordingly, the appeals court concluded that "*based on the state of law at that time*, Reed was not ineffective for not consulting with an expert regarding child interviewing techniques in this case."

The evidence produced at the evidentiary hearing also reflects that Mr. Reed's failure to call an expert did not necessarily deviate from professional standards based on the facts available at the time of trial.   On cross-examination, Mr. Reed clarified that C.C.'s age would have played a part in his decision not to call an expert regarding suggestibility because he had read treatises that suggestive interview techniques were a concern particularly where younger children were concerned.   Indeed, this was consistent with Ms. Swan's testimony.   She essentially testified that suggestibility concerns pertained only to children ages four to seven, and were virtually nonexistent by the time a child reaches the age that C.C. was at trial.

23

Certainly, Dr. Sanders offered a contrary opinion insofar as he opined that suggestibility was a concern as much with respect to a child's age as it was with respect to the child's family situation.   Even if it were assumed, however, that C.C. was amenable to suggestion and that Detective Hohnholt interviewed her in a suggestive manner, as Dr. Sanders testified, that does not equate to a finding that Mr. Reed's performance was deficient simply because he did not offer such testimony.   The evidence presented at the hearing reflected that Mr. Reed, Ms. Cameron, and Mr. Toth all had ample experience with criminal trials involving child sex abuse allegations, and that none of them had ever seen such testimony utilized at trial.   While Mr. O'Connor testified to the contrary, it is noteworthy that he graduated law school in 1993 and had been in private practice only since 1996.   Thus, although such expert testimony may have become more commonplace in recent years, it seems imminently reasonable to conclude that Mr. Reed, Ms. Cameron, and Mr. Toth, who were essentially seasoned veterans at the time this trial took place in 1997, would have been able to offer a more accurate perspective regarding whether utilizing this type of expert testimony was called for in 1997.   Given this, the court cannot say that it was objectively unreasonable for the Kansas Court of Appeals to find that Mr. Reed's failure to offer this type of expert testimony did not fall below an objective standard of reasonableness.

In so holding, the court is mindful of *Paine v. Massie*, 339 F.3d 1194 (10th Cir. 2003), in which the Tenth Circuit held that counsel's failure to offer expert testimony to help the jury understand the only theory of defense, which was battered woman syndrome, was deficient and fell below an objective standard of reasonableness.   *Id.* at 1204-05 (remanding for a prejudice

determination).   In that case, however, the Tenth Circuit pointed out that the propriety and admissibility of such evidence was well settled in state court.   *Id.* at 1202 (citing *Bechtel v. State*, 840 P.2d 1 (Okla. Crim. App. 1992)).   Counsel in *Paine* had failed to recognize the core teachings of *Bechtel* that such expert testimony was necessary to mount an effective self-defense claim under a battered woman syndrome theory.   *Id.*   Thus, the Tenth Circuit reasoned that "the professional standard at issue" was "established and clear."   *Id*. at 1203.   In sharp contrast, for the reasons discussed previously, the professional standard for offering expert testimony on suggestibility interviewing techniques in child sexual abuse cases was not established or clear in 1996.   Accordingly, the court is unpersuaded that Mr. Reed's performance was deficient simply because he did not consult with that type of expert.

The court acknowledges that, in hindsight, it would have been better for Mr. Lewis if Mr. Reed could have and would have presented expert testimony such as that presented by Dr. Sanders at the evidentiary hearing.   But the court must eliminate the distorting effects of hindsight and evaluate Mr. Reed's conduct from his perspective at the time of trial.   From this vantage point, the court is unpersuaded that the Kansas Court of Appeals unreasonably applied *Strickland*'s deficient performance principle by finding that Mr. Reed's failure to present that type of testimony did not fall below an objective standard of reasonableness.

### B.        Failure to Interview or Present Testimony of Eyewitnesses

It is unclear whether Mr. Lewis is alleging a constitutional violation insofar as counsel failed to contact or interview the six listed witnesses, or whether he is alleging a constitutional

violation for failure to present the testimony of those witnesses.  Thus, the court will address both aspects of the claim.[2]

### 1.   *Failure to Interview Eyewitnesses*

Under *Strickland*, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."   466 U.S. at 691.   Thus, counsel must "make reasonable investigations or reasonable decisions that particular investigations are unnecessary." *Romero v. Tansy*, 46 F.3d 1024, 1029 (10th Cir. 1995) (internal quotation omitted); *accord Coleman v. Brown*, 802 F.2d 1227, 1233 (10th Cir. 1986).   "The reasonableness of an attorney's decision not to conduct an investigation is directly related to the information the defendant has supplied." *Coleman*, 802 F.2d at 1233; *Strickland*, 466 U.S. at 691 ("[I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions.").   Therefore, whether counsel's failure to investigate was reasonable may depend upon the defendant's own statements or actions. *Romero*, 46 F.3d at 1029.

In this case, it does not appear from the record that Mr. Reed failed to investigate the perspectives of J.C., A.C., T.W., Anita West, Rita West, or LaTonia Wesley.  For example, J.C. testified that her mother would not allow her to talk to anyone about the incident.   Anita West testified that she talked to Mr. Reed one time outside of his office, and that LaTonia Wesley and she believed A.C. were with her.   Therefore, T.W. and Rita West are the only two witnesses

---

[2] The appeals court considered these two aspects of the claim together.

at issue who Mr. Reed arguably did not interview.  And Mr. Reed testified that although he did not specifically recall the names of witnesses who he interviewed, he worked closely with Mr. Lewis and his mother and that they would "share thoughts about witnesses and such."  Mr. Lewis testified at the evidentiary hearing that he had given Mr. Reed a list of witnesses to interview, which included Anita West, LaTonia Wesley, Rita West, T.W., J.C., and A.C.  Mr. Reed likewise testified that Mr. Lewis had named several family members who had been at the pool from time to time, so he knew of those people and "we" (meaning Mr. Reed and Mr. Lewis) had decided to present their viewpoint through Mr. Lewis rather than calling them.  He stated that he got his view of those witnesses through Mr. Lewis and his mother, made a decision about whether those witnesses' testimony would be helpful or not, and that he put on every witness that he thought would be helpful.  Thus, if Mr. Reed did not interview T.W. and/or Rita West, it appears that he made the decision based on information that he received from Mr. Lewis and Patricia that further investigation into those two witnesses' perspectives would not have been particularly helpful.  "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."  *Strickland*, 466 U.S. at 691.  Notably, at the evidentiary hearing, Mr. Lewis did not provide any testimony that controverts Mr. Reed's recollection that the three of them discussed the extent to which witnesses' perceptions would have been helpful.  Accordingly, given Mr. Reed's

uncontroverted testimony on this issue, Mr. Lewis failed to meet his burden of establishing that Mr. Reed's performance was deficient in this regard.[3]

### 2.      *Failure to Present Testimony of Eyewitnesses*

"Generally, the decision whether to call a witness rests within the sound discretion of trial counsel." *Jackson v. Shanks*, 143 F.3d 1313, 1320 (10th Cir. 1998); *see also Minner v. Kerby*, 30 F.3d 1311, 1317 (10th Cir. 1994) (the decision of what witnesses to call is a tactical one within trial counsel's discretion).     While this strategic decision is virtually unchallengeable if made after a thorough investigation, if made after less than complete investigation the decision is "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.     Given this standard, the court cannot say that the appeals court's ruling that Mr. Reed's performance was not deficient due to his failure to present the testimony of J.C., A.C., T.W., Anita West, Rita West, or LaTonia Wesley was an unreasonable application of the law or an unreasonable determination of the facts.

With respect to J.C., the appeals court correctly pointed out that the evidence at trial reflected that she was not interviewed by the police when her mother took her, C.C., and R.C. down to the police station to report the incident.   During closing arguments, Mr. Reed pointed out to the jury that the prosecution had not produced her as a witness and he told the jury that

---

[3] For the reasons explained in the next subsection, the court also finds that Mr. Lewis has failed to demonstrate that he suffered prejudice by virtue of Mr. Reed's alleged failure to investigate these witnesses.

he did not talk to J.C. because she was living with her mother and he was not allowed to have access to her.   It now appears that this argument was indeed correct, as J.C. testified at the evidentiary hearing that her mother would not allow her to talk to anyone about the incident. Furthermore, it is possible that if she had testified at trial her version of events would have been shaded to appease her mother and to avoid getting beaten by Mr. Shepherd, with whom she was living at the time of trial.   Mr. Reed's decision not to put this unpredictable witness on the stand appears to have been imminently reasonable.

His decision not to call A.C., T.W., Anita West, Rita West, and LaTonia Wesley as witnesses likewise was not beyond the reasonable bounds of professional judgment.    As explained previously, Mr. Lewis failed to meet his burden of establishing that Mr. Reed did not conduct a reasonable investigation with respect to these witnesses, either by interviewing them in person or by virtue of consulting with Mr. Lewis and Patricia regarding their rendition of events.    Furthermore, assuming that the testimony at the evidentiary hearing and affidavits presented in conjunction with Mr. Lewis's state habeas petition are representative of how these individuals would have testified at trial if they had been called as witnesses, their testimony would have been fairly unremarkable, to say the least.   A.C. submitted an affidavit and T.W., Rita West, and Anita West[4] all testified to the effect that they did not see Mr. Lewis touch C.C.

---

[4] It does not appear from the record or the appeals court's decision that LaTonia Wesley submitted an affidavit or testified at the evidentiary hearing.   Thus, the anticipated substance of her testimony is unknown.   On that basis alone the court finds that Mr. Lewis has failed to establish that Mr. Reed's performance was deficient insofar as he did not call Ms. Wesley as a witness at trial.

in a sexual manner and that C.C. did not act any differently after they left the pool on that day. Of course, A.C. and T.W. were only approximately eight and nine years old at the time and very well could have been busy playing in the pool, oblivious to things going on around them. Anita West was at the pool only briefly that day in order to drop off her son, and Rita West was in her car at the top of a hill and could only see the pool from a distance. Thus, the fact that any of these individuals did not see anything occur would have had minimal persuasive value. Their testimony also would have been cumulative of the testimony presented by the other defense witnesses who essentially conveyed that nothing happened on that day. The jury was unpersuaded by this theory of defense at trial and there is no reason to believe that if the defense had presented more witnesses on this issue the result would have been any different.

In sum, then, the court is unable to find that the Kansas Court of Appeals unreasonably applied *Strickland*'s deficient performance principle by finding that Mr. Reed's performance was not deficient by virtue of his asserted failure to interview these witnesses and/or to present their testimony at trial. Quite simply, his decisions in this regard did not fall below an objective standard of reasonableness.

## II.      C.C.'s Recantation of Her Testimony[5]

---

[5] Mr. Lewis filed an amended habeas petition in which he abandoned this theory as a separate ground for relief. He nonetheless continues to rely on what he characterizes as C.C.'s recantation of her testimony in support of his cumulative error argument. The court is therefore addressing the merits of this argument separately because it is pertinent to a proper resolution of his cumulative error argument.

Newly discovered evidence is generally insufficient to warrant habeas relief absent an independent constitutional violation. *Clayton v. Gibson*, 199 F.3d 1162, 1180 (10th Cir. 1999) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)). Specifically, a witness's recantation, even if truthful, does not warrant habeas relief absent evidence indicating the prosecutor knew that the witness's testimony was false. *Romano v. Gibson*, 239 F.3d 1156, 1175 (10th Cir. 2001). In this case, Mr. Lewis has failed to establish an independent constitutional violation via his ineffective assistance of counsel claim. Furthermore, there is no evidence to suggest that the prosecutor knew C.C.'s testimony was false. Certainly, then, it cannot be said that the appeals court's determination that he is not entitled to relief on the grounds of C.C.'s recantation does not amount to an unreasonable application of Supreme Court precedent.

Furthermore, Mr. Lewis has failed to establish by clear and convincing evidence that the appeals court made an unreasonable determination of the facts in light of the evidence presented at the evidentiary hearing. Out of an abundance of caution, the court acknowledges that the Tenth Circuit has recognized that the Supreme Court has not necessarily foreclosed the possibility that a truly persuasive demonstration of actual innocence might warrant habeas relief. *Clayton*, 199 F.3d at 1180. C.C.'s so-called recantation fails to rise to the level of being a truly persuasive demonstration of actual innocence. The district court judge, who is the judge who presided over the trial of this case, found that C.C. had failed to recant her trial testimony against Mr. Lewis. He explained "that while the victim wants to change her testimony she has failed to change it in a way that would produce a different result because she

31

still maintains that what she told her mother happened in the pool did indeed happen." As the appeals court further explained,

> the district court had ample evidence showing C.C.'s recantation may have originated from her sense of loyalty to her grandmother, Patricia, with whom she was currently residing.   Although C.C. wrote in one statement that Lewis never touched her, she informed the court that she told her mother that Lewis had touched her, but not that Lewis had touched her in a sexual manner.   In addition to claiming that her mother told her to lie, C.C. also alleges the prosecution told her to lie.   The prosecutor testified to the contrary, putting forth three occasions when C.C. had the opportunity to recant before trial.

Additionally, this court notes that Ms. Swan testified at the evidentiary hearing that recantations are common in sex abuse cases and the likelihood of recantation is much higher in unsupportive environments.   Certainly, the evidence reflects that C.C.'s environment is less than ideal.   She now says that her version of events at trial was influenced by pressures from her mother and the prosecutor.   Of course, back then she was living with her mother and her mother's physically abusive boyfriend.   Now that she is estranged from her mother and is living with her paternal grandmother, who is Mr. Lewis's mother, she contends that the touching, if any, was innocuous and this is buttressed with testimony by other witnesses whose interests are aligned with C.C.'s father's side of the family.   As between the two versions of events, either is equally plausible and there is no reason to believe that her testimony at the evidentiary hearing was any more truthful than the testimony that she gave at trial, which the jury believed to be persuasive.

In sum, then, this court cannot say that the Kansas Court of Appeals unreasonably applied Supreme Court precedent or made an unreasonable determination of the facts with

respect to what Mr. Lewis characterizes as C.C.'s recantation.   Accordingly, Mr. Lewis is not entitled to habeas relief on this basis.

**III.      Cumulative Error**

When two or more harmless errors result in potential prejudice to a defendant, the court may find cumulative error.  *Miller v. Mullin*, 354 F.3d 1288, 1301 (10th Cir. 2004), *petition for cert. filed*, No. 04-6188 (Sept. 3, 2004); *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003), *cert. denied*, 124 S. Ct. 2397 (2004).   A cumulative error analysis merely aggregates the prejudicial effect of errors which individually would be deemed harmless. *Miller*, 354 F.3d at 1301.   In reviewing a case for cumulative error, the court only aggregates the prejudicial effect of actual errors.   *Workman*, 342 F.3d at 1116.   Because the court's analysis has not disclosed any errors, then, Mr. Lewis is not entitled to habeas relief on the basis of cumulative error.

**CONCLUSION**

The record, briefs, and pleadings clearly establish that Mr. Lewis is entitled to no federal habeas corpus relief.   The Kansas Court of Appeals' decision that his trial counsel's performance was not deficient in violation of the Sixth Amendment readily withstands the AEDPA's deferential standard of review, as that decision was not contrary to nor did it involve an objectively unreasonable application of federal law or an unreasonable determination of the facts.   The appeals court's decision that Mr. Lewis is also not entitled to relief on the basis of what Mr. Lewis characterizes as C.C.'s recantation of her trial testimony likewise withstands

these same AEDPA standards.   Absent any error then, Mr. Lewis is not entitled to relief on the

basis of cumulative error.   As such, Mr. Lewis's request for habeas relief is denied.


**IT IS THEREFORE ORDERED BY THE COURT** that petitioner's habeas corpus

petition pursuant to 28 U.S.C. § 2254 (doc. 1) is denied.


**IT IS SO ORDERED** this 25th day of January, 2005.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge